# EXHIBIT 1

## DISTRIBUTION AGREEMENT

**Parties, Appointment and Purpose:** This Agreement is between Bogle Vineyards, Inc., 37783 County Road 144 , Clarksburg, CA 95612: PH (916) 744-1139 (office) attn: Ryan Bogle Vice President ("Supplier") and Winebow Distribution Companies, 75 Chestnut Ridge Road, Montvale, NJ 07645: PH: 201-930-2454 attn: Franklin Shobe, President ("Distributor"). Supplier is appointing Distributor to sell Supplier's Products within Distributor's Territory. Exhibit A describes the "Products," "Territory" and contains the terms of sale. The Territory shall be exclusive except as set forth on Exhibit A. Both parties know that their individual success will be determined by how effectively and efficiently they cooperate with each other. Both parties agree that the goal of this Agreement is to deplete to retail as much of the Products as possible while maintaining quality control, and preserving the image of Supplier's brand and Distributor's goodwill with its customers while at all times dealing with each other fairly and in good faith.

(1) **Distributor's Representations:** Distributor's primary job is to sell and deplete to retail Supplier's products to eligible on-premise and off-premise retail accounts in the Territory as described in the mutually agreed-upon "Sales Requirements" standards on Exhibit B. Distributor promises that it: (a) has the state, federal and local licenses and permits necessary for it to do its job; (b) will keep these licenses and permits current; (c) will obey all relevant laws and regulations; (d) acknowledges Suppliers sole right and interest in its trademarked brands, intellectual property and trade dress and will help Supplier protect them from infringement, at Supplier's sole expense; (e) will transport, store and insure Supplier's products as required by the "Transportation, Storage, Insurance and Quality Control" guidelines on Exhibit D; (f) will sell only Products of merchantable quality as set forth on Exhibit D; (g) will provide sales reports and important market information as described on Exhibit C; (h) will pay Supplier for Products as called for by Exhibit A; (i) will not transfer or assign its rights under this Agreement (including by way of a change in control of more than 50% of Distributor) unless it has obtained Supplier's permission to do so as set forth on Exhibit G; (j) will indemnify, defend and hold Supplier harmless from all third party claims, losses and expenses (however arising), including reasonable attorneys fees and costs, caused by negligent acts (including misfeasance or nonfeasance) by Distributor in connection with the Products; (k) will provide access to Distributor's sales people to "ride with" and to communicate and follow up on specific account information; (l) will provide access to Distributor's warehouse to inspect inventory and point of sale merchandise; (m) agrees to develop an sales and distribution plans (as described in Exhibit B) with mutually agreed upon goals, recognizing that goals in future periods will be based upon previous period sales and distribution performance plus a reasonable increase taking into consideration seasonality, previous period trends, market conditions, new opportunities and sales and distribution performance of like distributors in like markets; and (n) will provide "Samples and Services" as set forth on Exhibit E.

(2) **Supplier's Representations:** Supplier's primary job is to assure that Distributor is furnished with Products and included in marketing decisions that affect the Territory. Supplier promises that it: (a) has the state, federal and local licenses and permits necessary for it to do its job; (b) will keep these licenses and permits current; (c) will obey all relevant laws and regulations; (d) will allocate its Products at its sole discretion from time-to-time as is necessary in conformance with the general principle that Products should be available throughout the United States in all similarly situated markets; provided, however, that Supplier shall first allocate limited Product supplies to those distributors who have entered into written agreements

in substantially the format of this Agreement with Supplier, and shall thereafter allocate Product supplies (if any remain) to other distributors; (e) will assure that all Products are of merchantable quality when delivered to Distributor and will deal with unmerchantable Products as set forth on Exhibit D; (f) will provide information as described on Exhibit C; (g) will be responsible for producing, bottling, packaging and labeling the Products as required by state and federal law; (h) will provide "Samples and Services" as set forth on Exhibit E; and (i) will indemnify, defend and hold Distributor harmless from all third party claims, losses and expenses (however arising), including reasonable attorneys fees and costs, caused by defective manufacture or processing of the Products, negligent acts (including misfeasance or nonfeasance) by Supplier in connection with the Products, any claim related to Supplier's advertising of the Products or claims relating to Supplier's trademarks, trade dress or intellectual property.

**(3)** **Term and Termination:** This Agreement shall be effective on January 1, 2011, and shall remain in force until December 31, 2011. Commencing on January 1, 2012 the Agreement shall be automatically extended for successive one-year terms unless Supplier or Distributor gives notice to the other of its intention not to renew the Agreement as described in Exhibit F. Exhibit F also describes the standards to be applied to a determination of breach.

**(4) General Legal Matters:**

    (a) **Governing Law, Amendments and Merger:** This Agreement shall be governed by the law of the state of California, may not be amended except by a writing signed by both parties, and shall supersede any and all prior discussions between the parties concerning the subject matter. If, and only to the extent that, the provisions of the laws of the state in which the Distributor is located, or any similar law or regulation, govern the sale of products by Supplier to Distributor, then the terms of this Agreement are deemed modified to conform to those provisions. If any of those provisions are repealed or are otherwise not governing or applicable in whole or in part, then the terms of this Agreement govern the sale of products by Supplier to Distributor.
    (b) **Waiver:** No waiver by either party of a right on any one occasion shall constitute a waiver of such right on another occasion, and all such claimed waivers must be in writing signed by the party against whom the waiver is claimed.
    (c) **Enforceability of Clauses:** If any provision of this Agreement violates any law, it shall be severed from this Agreement without affecting the rest of the Agreement.
    (d) **No Franchise Relationship, Waiver of State Law Rights and Consent Required:** Neither party is the agent, franchiser or franchisee of the other party and nothing in this Agreement shall be interpreted in any fashion or manner to create such a relationship, and neither party, under any circumstances, may bind the other party to any agreement or obligation to any third person without the written consent of the party being bound. Distributor agrees, to the full extent permitted by the law of Distributors state, to waive any rights or procedures that are for Distributors benefit and that are inconsistent with this Agreement;
    (e) **Warranty of Authority:** Both parties represent and warrant that they have the full right and authority to enter into this Agreement without violating the rights of any third party.
    (f) **Notices:** All notices shall be in writing and sent to the addresses set forth above. All notices shall be deemed delivered: (i) one business day after such are deposited for delivery via Federal Express or other nationally recognized overnight courier service; or (ii) three business days after such are deposited in the United States mails, certified or registered mail, with all

postage prepaid. Written notice may be given by email or by telecopy to the Telecopier numbers set forth above, provided that such notice shall not be deemed effective unless it is confirmed within 24 hours by courier delivery or mailing of a copy of such notice in accordance with the requirements set forth above.

(g) **Disputes:** All disputes that may arise between the parties regarding the interpretation or application of this Agreement and the legal effect thereof shall, to the exclusion of any court of law, be arbitrated and determined by arbitration in California pursuant to California Code of Civil Procedure section 1280 *et seq.* unless the parties can resolve the dispute by mutual agreement. Either party shall have the right to submit any dispute to arbitration fifteen (15) days after the other party has been notified as to the nature of the dispute. In the event either party incurs attorney's fees as a result of a dispute regarding this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, as determined by arbitration. The non-prevailing party shall pay to the prevailing party all reasonable attorneys' fees and costs and expenses of any type, without restriction by statute, court rule or otherwise, incurred by the prevailing party in connection with any action or proceeding (including arbitration proceedings, any appeal and the enforcement of any judgment or award), whether or not the dispute is prosecuted to final judgment. The "prevailing party" shall be determined based upon an assessment of which party's major arguments or positions taken in the action or proceeding could fairly be said to have prevailed (whether by compromise, settlement, abandonment by the other party of its claim or defense, final decision, after any appeals, or otherwise) over the other party's major arguments or positions on major disputed issues.

Both parties have negotiated this Agreement freely and in good faith with the assistance of their counsel, acknowledge having read all of the terms of the Agreement and the Exhibits, and fully understand that they are each obligated to fulfill the promises they have made to each other.

SUPPLIER:

By /s/
Title: President
Dated: 2/16/11

DISTRIBUTOR

By /s/
Title: President
Dated: 2/8/11

# EXHIBIT A

## PRODUCTS, TERRITORY, EXCLUSIVITY AND TERMS OF SALE

1. **Products:** All branded products produced by Supplier designated for wholesale sale.

2. **Prices:** Supplier will furnish Distributor with a price list. Supplier may amend this price list upon 30 days' written notice to Distributor.

3. **Territory:** State: Illinois Counties: Per attached Registration Statement

4. **Exclusivity:** The territory shall be exclusive to Distributor so long as the requirements of this Agreement are satisfied

5. **Inventory Levels and Ordering Cycles:** Subject to the allocation provisions [see agreement paragraph 2(d), and Exhibit B], Distributor shall at all times: (a) maintain an inventory level of the Products sufficient to satisfy projected sales within the Territory for a 45-day period taking into account anticipated consumer demand on a seasonal basis and Distributors forecast for the following quarter; and (b) notify Supplier within a reasonable period of any event within the Territory that could result in monthly projections varying more than ten percent [10%] during any particular period.

6. **Terms of Sale:** Distributor's orders are subject to acceptance by Supplier at its office address set forth in this Agreement. Supplier may accept or reject orders and may request that Distributor use Supplier's forms and procedures; provided, however, that in the event of any conflict or inconsistency between the provisions of this Agreement and such forms or procedures, the terms of this Agreement shall control. Distributor shall pay Supplier for Products shipped at the price stipulated on each invoice. Payments shall be due and payable in cleared funds by check or electronic funds transfer (or as otherwise agreed to by Supplier in writing) received by Supplier not later than 30 days from the date of invoice. Invoices may be transmitted to Distributor by facsimile machine or by mail. If cleared funds are not received by Supplier for any invoice within 30 days, Distributor shall pay a late charge of 1.5% of the price set forth on the invoice for each 30-day period, or part thereof, that such invoice shall remain unpaid.

   Supplier may, from time to time, set forth credit limits applicable to Distributor's purchases. If, in Supplier's judgment, Distributor should not be granted or continue to receive credit, whether because of an arrearage in its payments or otherwise, then Supplier has the unqualified right to reduce or withdraw entirely Distributor's credit limit (if any) or only to sell to Distributor on a cash basis, without prior notice. Supplier acknowledges that Distributor's credit terms are 30 days from date of invoice. Failure by Distributor to pay any sum by the due date for payment shall entitle Supplier to suspend any further performance under this Agreement (without prejudice to any right Supplier may have to terminate this Agreement).

   Distributor may not bill Supplier back for any expenses incurred by Distributor without the express written authorization of Supplier. Title to Products and risk of loss pass to Distributor when the Products have been loaded upon a carrier at Supplier's premises. Supplier reserves, and Distributor grants to Supplier, a security interest in Products sold

to Distributor on credit (if any). Distributor acknowledges that this Agreement constitutes a security agreement between Supplier, as secured creditor, and Distributor, as debtor, for the purposes of the Uniform Commercial Code. Distributor agrees to execute and deliver to Supplier such financing statements and other instruments as Supplier may reasonably request in order to perfect its security interest.

Initialed: _____ [Supplier] _____ [Distributor]

Dated: 2/16/11    2/8/11

## EXHIBIT B - SALES REQUIREMENTS

The agreed-upon depletion requirements broken down by Supplier's products will be negotiated in good faith no later than the last quarter of every year for the upcoming year and shall be broken down by quarters. The quarters shall be January 1st through March 31st, April 1st through June 30th, July 1st through September 30th and October 1st through December 31st.

Distributor shall achieve the annual depletion requirement for each product, understanding that the depletion of Supplier's entire line of products to plan is a primary purpose of this Agreement, and the reason for the engagement of Distributor. In the event that the annual depletions for any specific product are less than 100% of the annual requirement, Distributor shall be in breach of the Agreement.

The depletion requirements for the current calendar year will be set forth as Exhibit B-1 beginning in [year].

**Account Placements:** On-premise and off-premise placement of Supplier's products is a primary purpose of this Agreement. Distributor warrants that Supplier's wine shall be placed into not less than the total number of on-premise and off-premise accounts in the Territory by December 31st of each year that will be set forth on Exhibit B-2 beginning in [year]. The on-premise and off-premise placement goal of this Agreement shall be renegotiated in good faith in the first quarter of every year. Exhibit B-2 will include specification of special chain accounts into which Supplier's products will be placed before the end of the current calendar year.

**Allocation:** Allocation of the Products within the Territory shall be mutually-agreed upon between Supplier and Distributor not less than once per year or more often in the event of Product shortages for any reason. Distributor has sixty days from the date of receiving an allocation to pick up the allocated Products. In the event that the allocation is not picked up within sixty days, Supplier may allocate such Products to other distributors in Supplier's sole discretion.

**No Dumping:** No on-premise or off-premise retail account (consisting of one retail location or a group of affiliated retail locations considered to be one "account"), other than those identified and preapproved by Supplier, may account for more than 20% of Distributors sales during any calendar year, commencing in calendar year 2012. In the event that more than 20% of Distributors total sales during any one calendar year are made to one or more affiliated retail accounts, Supplier shall consider Distributor to be "dumping" product on the market, which adversely affects Supplier's brand image in contravention of the purpose of this Agreement. In the event that sales in excess of 20% are made to one retail account (as defined herein), not previously approved, during any calendar year, the amount of such sales in excess of 20% shall not be counted towards satisfaction of Distributor's sales obligations in accordance with this Agreement.

Initialed: __WB__ [Supplier]   __TL__ [Distributor]

Dated: __2/16/11__   __2/8/11__

BOGLE VINEYARDS, INC. DISTRIBUTION AGREEMENT WITH WINEBOW
DISTRIBUTION COMPANIES [ILLINOIS]

- 6 -

# EXHIBIT C

## REPORTING

(1) **REPORTS:** Distributor will report the following information (by vintage, varietal and designation) on the schedule set forth below:

| | |
|---|---|
| *Depletions by Account* | *10 days after month end* |
| *Distributor Inventory* | *10 days after month end* |
| *Annual Sale Plan Objective Review:* | *Annually* |
| *Sales by On-Premises* | *10 days after month end* |
| *Sales by Off-Premises* | *10 days after month end* |
| *Current Accounts Sold over Last 90 Days* | *Quarterly* |
| *Top 50 Accounts Quarterly* | *Quarterly* |
| *Top 50 Distributor Accounts Quarterly* | *Quarterly* |

(2) **MEETINGS:** Distributor shall appoint a Brand Manager whose responsibilities shall include being available at all times to respond to Supplier's inquiries. Such appointment shall be subject to the approval of Supplier, which approval shall not be unreasonably withheld. Supplier, and the Brand Manager for Supplier's products, agrees to meet (in person or by telephone) not less than four times every year (at the end of each quarter) for the purpose of joint planning. The primary objective of such meetings shall be to review Distributor's performance during the preceding period, to develop plans to achieve depletion and placement goals during the up-coming period. Neither Distributor nor Supplier shall be required to bear any costs of travel, room and board, etc., associated with the other party's time or travel to attend such meetings.

(3) **PROTECTION OF INFORMATION EXCHANGED:** Distributor and Supplier agree that each needs accurate and timely information from the other on a regular basis to do its job properly. Each promises that it will protect and safeguard the information that it receives from the other and will not share it with any person outside of Supplier's or Distributor's organization unless: (a) the party furnishing the information has given prior written permission for such information to be shared; (b) it is required to do so by a competent authority; or (c) for the purposes of enforcing the terms of this Agreement. Both parties acknowledge that information received from the other would be useful to competitors, and if furnished to such competitors, would cause the supplying party harm in the marketplace.

Initialed: WB [Supplier]   X [Distributor]
2/16/11
Dated: 2/8/11

## EXHIBIT D

### TRANSPORTATION, STORAGE, INSURANCE AND QUALITY CONTROL GUIDELINES

Distributor will maintain a cool, steady, ambient temperature (between 40 and 60 degrees F) in all vehicles and storage facilities it uses during the shipment, storage, and delivery of Products. Distributor will ensure that only products of merchantable quality are sold understanding that wine is perishable, and that if Distributor permits Product to be stored or shipped outside of the specified temperature ranges, Distributor shall be responsible for all Product returns. Unmerchantable product is defined to be Product that (a) is spoiled, putrid or foul, or (b) has sustained damage to its primary or secondary packaging and is no longer commercially marketable. The party responsible for the unmerchantable Product shall be responsible for the costs of collecting (or returning, at Supplier's option) such Products from the marketplace.

Each party will promptly notify the other of complaints and/or proceedings in the Territory relating to the Products. Each party shall provide the other with all reasonable cooperation and assistance to investigate the same and will use best efforts to comply with any reasonable requests made by the other party in the course of dealing with such complaints or proceedings.

Each party warrants that it has, and shall continue to maintain at all times during the term of this Agreement, at its expense, commercial general liability insurance covering Products and complete operations in an amount not less than $2 million per occurrence in respect to bodily injury and property damage. Each party agrees to provide the other with a certificate of insurance. Such certificate shall provide that insurance coverage may only by terminated or materially modified upon at least 30 days prior written notice by the insurance company to the party affected.

Initialed: ___WB___ [Supplier]   ___JS___ [Distributor]

Dated: __2/16/11__   __2/8/11__

## EXHIBIT E

### SAMPLES AND SERVICES

Distributor and Supplier shall share the costs of all Product samples used in the Territory, at Distributor's laid-in cost, as follows: 50/50 subject to Supplier approval of samples exceeding one case. No bill backs older than 90 ninety days shall be honored and bill backs submitted with supporting documentation shall be paid within 60 days of submission unless disputed.

All paper point-of-sale and promotional materials produced by Supplier shall be made available to Distributor at no cost to Distributor in such amounts and at such times as Supplier determines, in its sole discretion.

Distributors and Suppliers Brand Investment, which includes discounts and incentive programs, local event participation, promotional merchandise, samples, advertising, or special promotional programs, will be the subject of separate agreements between Supplier and Distributor made from time-to-time.

Distributor may create point-of-sale materials in addition to those furnished by Supplier subject to the following conditions, (1) Distributor is solely responsible for meeting all federal and state requirements for such point-of-sale material; (2) Distributor bears all costs of materials used unless Supplier agrees otherwise; (3) Distributor bears all legal responsibility for point-of-sale materials, including, but not limited to, obtaining pre-approval when necessary, payment of administrative penalties, and payment of defense fees for any related administrative action, and (4) Distributor must obtain pre-approval from Supplier for any point-of-sale material produced in quantities greater than 100 per retail account. No rights of ownership to the intellectual property of Supplier are transferred by virtue of this provision.

Distributor will, prior to incurring an expense for which it expects reimbursement from Supplier, in whole or in part, obtain Supplier's prior written approval.

Distributor shall provide no less a service to its customers who purchase the Products than it does for other products which it sells and shall maintain an appropriate sales force, delivery system and take other appropriate measures to increase sales and distribution of the Products in the Territory.

Distributor shall, at Distributors expense (and whether or not at the express direction of Supplier), provide Supplier with all such delivery and merchandising services as are necessary for the regular servicing of all on-premise and off-premise retail accounts in the Territory, including chain stores and chain restaurants. Distributor shall use its best efforts to fully and completely cooperate with Supplier in the execution of such national, regional and local marketing programs as are, from time to time, developed by Supplier.

Initialed: _WJ_ [Supplier]   _[signature]_ [Distributor]

Dated: 2/16/11   2/8/11

BOGLE VINEYARDS, INC. DISTRIBUTION AGREEMENT WITH WINEBOW
DISTRIBUTION COMPANIES [ILLINOIS]

- 9 -

# EXHIBIT F

## TERMINATION PROVISIONS

**Termination**

It is the express intention of the parties that each party has the right to terminate or not renew the annual term of this Agreement for the reasons stated below without incurring any liability to the other party, except as expressly set forth herein.

Supplier may cancel or otherwise terminate this Agreement immediately and without notice if the Distributor: (i) is insolvent; (ii) has given an assignment for the benefit of creditors; (iii) has filed for bankruptcy; (iv) has had its alcoholic beverage license suspended for more than 14 days; (v) has had its alcoholic beverage license revoked; (vi) has intentionally defrauded supplier; or (vi) has transferred, or attempted to transfer, its rights under this Agreement to any other person or entity, including by way of a change in control of more than 50% of Distributor, without the consent of the other party, which consent shall not be unreasonably withheld.

Either party may terminate this Agreement at any time, for "good cause" upon 30 days notice, provided the other party fails to cure as provided below. "Good cause" shall mean (i) negligent or intentional misrepresentation of a material fact; (ii) the failure to fulfill any of the representations in this Agreement; or (iii) the failure to meet 90% of the performance criteria per varietal established by the parties in Exhibit B for two consecutive calendar years, as measured on an annual basis during the calendar year of this Agreement. In the event the termination is for good cause, then during the 30-day period after receipt of written notice, the other party has the right to cure any default, deficiency, breach of promise or failure of performance set forth in the notice of termination or non-renewal as a basis for termination/non-renewal for cause, if the same is curable. If the defaulting party fails substantially to cure the default within the 30-day period, then the other party may immediately thereafter terminate or not renew the Agreement without incurring any liability whatsoever for damages. If the defaulting party cures the default within the 30-day period, then the Agreement remains in force and the other party cannot terminate without incurring liability, except as provided herein.

**Return of Materials**

Upon expiration or any termination, within 30 days after the effective date of such expiration or termination, Distributor shall return to Supplier (or shall make disposition of as directed by Supplier) all property belonging to Supplier in Distributor's possession or control. Such return (or other disposition) shall be at Supplier's expense.

**Repurchase of Inventory**: Supplier shall, at Supplier's option, have the right to repurchase all or part of the products produced by Supplier in Distributor's possession at Distributors laid-in cost for such products.

**Balancing of Accounts:** No later than 30 days after the effective date of termination of this Agreement, each party shall submit to the other a statement of account detailing sums allegedly owing to or from the respective party to the other party. Both parties will then make a good faith effort to negotiate with each other and to balance the accounts between themselves. Any issues

left open between the parties at the completion of the negotiations shall be submitted to dispute resolution as provided in this Agreement.

**Appointment of Replacement Distributor**

Supplier shall be entitled, following the receipt of any notice of termination by the party terminated, to appoint a successor to Distributor as distributor in the Territory who shall be entitled to make himself known during the notice period as Supplier's distributor able to do business in relation to the Products with effect from the day after termination of this Agreement. Distributor will use best efforts to cooperate fully with all reasonable requests made by Supplier or any such successor distributor in order to ensure the orderly transfer of the business related to the Products to such successor.

Initialed: _WF_ [Supplier]   _JS_ [Distributor]

Dated: _2/14/11_   _2/8/11_

# EXHIBIT G

## DISTRIBUTION RIGHTS TRANSFER POLICY

Distributor shall not transfer, assign or delegate its Product distribution rights or duties under this Agreement without the prior written consent of Supplier. Supplier shall not unreasonably withhold or delay such consent provided the conditions set forth below have been met.

Supplier's consent shall be required for every transaction (i) in which Distributor, directly or indirectly, sells, assigns, conveys, transfers, encumbers, alienates or hypothecates an interest in Supplier's Products distribution rights to any person, group or entity not in control of Distributor's corporation or business at the time this Agreement is entered into, or (ii) which does or can result in a shift or realignment of Distributor's policy-making executive management.

Distributor shall timely report any proposed transaction in sufficient detail to permit Supplier to make an independent assessment of the transaction in terms of the likely impact on the distribution of Supplier's Products. Distributor shall submit a written request for a transfer of distribution rights to a designated wholesaler, along with a completed application, in a form supplied by Supplier, from the prospective successor. Supplier's consent shall be dependent on (i) the completed application, (ii) personal interviews with the prospective successor's senior management, which will address the prospective successor's competitive capacity, willingness to commit resources to the distribution of Supplier's products, its creditworthiness, its updated market plans and its approach in terms of increasing distribution of Supplier's products, and (iii) Supplier's independent investigation of market options and alternatives. To expedite Supplier's evaluation of the prospective successor, Supplier encourages the prospective successor to submit, as early as possible, a written marketing plan covering the balance of the current calendar year and the next annual period. The marketing plan should include strategic and tactical plans for achieving fixed sales and distribution goals, pricing strategy, cooperative advertising and in-market promotional spending by the wholesaler, and such other commitments the wholesaler deems appropriate to offer at the time.

Supplier's written approval shall be conditioned on the prospective successor entering into a new distribution agreement with Supplier. Distributor will be required to pay in full any outstanding indebtedness to Supplier before Supplier gives its consent to the proposed transaction.

Initialed: ____[Supplier]  ____[Distributor]

Dated: 2/16/11   2/8/11